IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**TRUSTEES OF THE OREGON-**            Civil Case No. 3:10-CV-01047-KI
**WASHINGTON CARPENTERS-**
**EMPLOYERS HEALTH AND WELFARE**
**TRUST FUND**, et al.,                  OPINION AND ORDER

        Plaintiffs,

   vs.

**ANDERS CERTIFIED WELDING, INC.,**

        Defendant.

     Stephen H. Buckley
     Cary R. Cadonau
     Brownstein, Rask, et al.
     1200 SW Main Street
     Portland, Oregon  97205

        Attorneys for Plaintiffs

Page 1 - OPINION AND ORDER

Frank S. Wesson
Wesson & Duncan
12725 SW 66th Avenue, #101
Portland, Oregon  97223

       Attorney for Defendant

KING, Judge:

Plaintiffs are the Pacific Northwest Regional Council of Carpenters ("Union") and the trustees of four trust funds which are employee welfare benefit plans or employee pension benefit plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  Plaintiffs seek union dues and unpaid fringe benefit contributions from defendant Anders Certified Welding, Inc. ("Anders").  Plaintiffs claim Anders owes the trust funds dues and contributions under the terms of a collective bargaining agreement ("CBA," also known as a Master Labor Agreement or "MLA").  Anders contends no CBA was in effect under which plaintiffs can collect the alleged delinquent contributions.  The parties filed cross motions for summary judgment.  For the reasons below, I grant summary judgment for plaintiffs.

## FACTS

Anders is a family-owned business with four employees, located in Carlton, Oregon. Theodore and Cathy Overholt incorporated Anders in July 1995.  Theodore Overholt was a member of the Union before he started Anders.

On July 20, 1995, Theodore Overholt executed a Carpenters Compliance Agreement on behalf of Anders.  The two unions listed in the Compliance Agreement are the predecessors of plaintiff Union.  The Compliance Agreement is the only document Anders ever signed regarding

Page 2 - OPINION AND ORDER

Anders' relationship with the Union.  Notably, Anders never executed a MLA with the Union.

The Compliance Agreement states in relevant part:

> The undersigned Employer hereby agrees with the [Union] that it will be bound and abide by all the terms, including wages, hours, and working conditions set forth in the principal Agreements shown below, and the terms and conditions of all successive principal Agreements as may be executed by the signatory parties thereto:

> Master Labor Agreement        AGC [ ]        GCCA [ ]        COMP [X]

Ashback Decl. Ex. A, at 1.

Checking the COMP box means that the Union and employer are bound by the MLAs the Union negotiates with two multi-employer bargaining associations, the AGC and the GCCA.

After listing other MLAs that were not checked, the Compliance Agreement continues:

> The undersigned Employer agrees to be bound by the Agreements governing, and to make contributions to the [trust funds], and shall further be bound by . . . any amendments, modifications, extensions, supplementation's [sic], and renewals of any of the Agreements set forth above . . . .

> . . . .

> Any and all work described within the Carpenters Master Labor Agreement, and falling under the jurisdiction of the Union and its' [sic] affiliated locals, which is performed by the Employer and/or his subcontractors(s), shall be covered by the provisions of said Agreement.

Id.

The Compliance Agreement continues:

> This Agreement shall be effective as of the date hereof, and shall continue in effect during the term of the applicable Agreements referred to above, and during the term of all successive Agreements.  Either party may terminate this Agreement as of the termination date specified in the principal Agreements, or on the termination date specified in any successive Agreement, by giving the other party notice of an intention to terminate, by certified or registered mail, at least 90 but not more than 120 days in advance of such termination date.

Id. at 2.

When Anders and the Union executed the Compliance Agreement, the GCCA MLA and the AGC MLA in place both covered the period from June 1, 1993 through May 31, 1997. Both MLAs were replaced by subsequent MLAs several times. The most recent GCCA MLA covers the period of June 1, 2008 through May 31, 2013; the most recent AGC MLA covers the period of June 1, 2009 through May 31, 2011. The MLAs define bargaining unit work as work that is within both the territorial and craft jurisdictions specified in the MLAs. The MLAs require an employer to pay fringe benefit contributions to the trust funds and union dues to the Union at specified hourly rates on behalf of the employer's employees who perform bargaining unit work.

On November 19, 2009, Theodore Overholt notified the Union's Executive Secretary, Doug Tweedy, that Anders could no longer afford to pay the contributions and dues for its employees. At that time, the two MLAs in effect had termination dates of May 31, 2011 and May 31, 2013. On July 20, 2010, the Union's counsel sent a letter to Overholt stating that the withdrawal was ineffective because it was not within the time period allowed under the MLAs.

On March 14, 2011, all four of Anders' employees signed a petition stating their desire to no longer be represented by the Union. On March 25, 2011, Theodore Overholt sent the petition to Tweedy and informed him that Anders was withdrawing its recognition of the Union.

Cathy Overholt is responsible for the bookkeeping. She completed reports and payroll summaries for the trust funds. Cathy Overholt only paid contributions and dues for Theodore Overholt and Michael Livermore because they were the only Union members at Anders. Cathy Overholt did not think that contributions and dues had to be paid for employees who were not Union members, even if they were performing work covered by the MLA. She also did not think

contributions and dues had to be paid if a Union member was working on a job in which the general contractor was not a signatory with the Union.  Although the Union representative had been to many of the job sites at which Anders worked, the Union never informed Anders that it was not paying all contributions and dues which it owed under the agreements.  No Anders employee ever received benefits from any of the trust funds.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to point out the absence of any genuine dispute of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains a fact dispute to be tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party."  Nicholson v. Hyannis Air Serv., Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

**DISCUSSION**

Plaintiffs seek $186,800.43 in fringe benefit contributions and union dues for the time period from July 1, 2006 through June 30, 2010, plus interest, liquidated damages, various costs, and attorney fees.

I.      ERISA Jurisdiction

Anders argues plaintiffs cannot bring their claims under ERISA because the statute specifically excludes actions in which defendants never signed a CBA, as plaintiff argues is the

case here.  Anders relies on <u>Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.</u>, 484 U.S. 539, 108 S. Ct. 830 (1988), in which the court differentiated employers' contractual obligations from their statutory obligations which arise under the National Labor Relations Act, 29 U.S.C. § 151 <u>et seq.</u>  Plaintiffs claim <u>Advanced Lightweight Concrete</u> does not apply here because Anders breached its contractual obligations to contribute.

To introduce the issue in <u>Advanced Lightweight Concrete</u>, the Court explained:

> A company that is a party to a collective-bargaining agreement may have a contractual duty to make contributions to a pension fund during the term of the agreement and, in addition, may have a duty under the National Labor Relations Act (NLRA) to continue making such contributions after the expiration of the contract and while negotiations for a new contract are in process.

<u>Id.</u> at 541.  Alleging federal subject matter jurisdiction under ERISA, the trusts sued the employer in federal court to collect contributions for the period *after* the CBA had expired.  The Court affirmed the Court of Appeals' conclusion that the remedy under ERISA "is limited to the collection of 'promised contributions' and does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA."  <u>Id.</u> at 549 (quoting 126 Cong. Rec. 23039 (1980) (statement of Rep. Thompson)).

Here, plaintiffs are seeking to collect contributions owed under the CBA while it is in effect.  Their theory is a claim under ERISA, even though Anders contends it does not owe a contractual duty because it never signed the CBA.  Plaintiffs are not seeking contributions owed under the NLRA after a CBA expires and negotiations are underway.  Thus, <u>Advanced Lightweight Concrete</u>, which dealt with statutory NLRA obligations after the CBA expires, does not apply.  This court has federal subject matter jurisdiction under ERISA.

II.    <u>Contractual Obligations</u>

Anders bases its defense on the fact that it never signed the MLA, did not execute a new

compliance agreement after the MLA in place at the time Anders signed the Compliance

Agreement expired, and withdrew recognition of the Union on March 25, 2011.

First, I will explain the use of these common labor agreements.

> The "short form" or "compliance agreement" . . . [are] agreements utilized
> by labor unions and smaller contractors working in the construction industry.
> Through the use of such agreements, a smaller, usually independent, contractor
> agrees to be bound by a collective bargaining agreement negotiated by a union and
> multi-employer bargaining group representing contractors within a particular
> jurisdiction and pays contributions according to the terms of such agreements.

<u>Carpenters Local Union No. 345 Health and Welfare Fund v. W.D.</u>, 792 F.2d 64, 68 (6th Cir.

1986).

> [T]he basic purpose of a "me-too agreement" [also known as a short form or
> compliance agreement] is to allow independent, usually smaller, employers to
> obtain all the benefits of the master collective bargaining agreement that is
> negotiated by the principal employers in the industry without having to participate
> in the industry negotiations, or to engage in separate negotiations, every few years.
> Thus, the independent employer is assured that (1) it will not be subject to a
> contract containing more onerous conditions than are applicable to its
> competitors, (2) it will obtain whatever protections or advantages the industry
> collective bargaining agreement provides other employers, (3) it will be saved the
> cost of expensive negotiations, and most pertinent here, (4) it will be covered by
> an agreement whenever the rest of the industry is covered and not subject to an
> agreement whenever the rest of the industry is not.  "Me-too agreements"
> generally contain a termination clause which allows the independent employer to
> terminate its agreement whenever a master labor agreement is about to expire, by
> giving thirty days notice of its desire to do so.

<u>Arizona Laborerss Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.</u>, 753 F.2d

1512, 1518-19 (9th Cir. 1985).

Page 7 - OPINION AND ORDER

Furthermore, an employer can obligate itself indefinitely into the future. "[A] signatory to a Short Form Agreement can agree to be bound by future modifications, extensions and renewals of an MLA." Construction Teamsters Health and Welfare Trust v. Con Form Constr. Corp., 657 F.2d 1101, 1103 (9th Cir. 1981).

The Compliance Agreement Theodore Overholt executed on behalf of Anders obligated Anders to pay the contributions and dues for the MLAs then in effect, and all successors to those MLAs, until Anders terminated the Compliance Agreement as provided in its terms. For an effective termination, Anders had to notify the Union of the termination between 90 and 120 days prior to the termination date of the MLA in effect at that time. Theodore Overholt's termination notification on November 19, 2009 was more than a year early to be an effective termination for the GCCA MLA, which terminated on May 31, 2013, and the AGC MLA, which terminated on May 31, 2011.

Plaintiffs are not seeking damages for any time after June 30, 2010 so I do not need to determine if Anders' termination notification of March 25, 2011 was effective.

There is absolutely no contractual requirement that an employer sign the MLA to be bound by its terms, if the employer signs a compliance agreement. Consequently, Anders owes the contributions and dues which plaintiffs seek to collect.

III.    Additional Defenses

Anders raises several additional defenses against its contractual obligations.

A.    Mutual Assent

Anders claims the parties never had the meeting of the minds required to form a legally binding contract because Anders' management had a fundamental misunderstanding of the terms

of the contract.  It relies on Cathy Overholt's explanation that she believed union contributions were only owed for Theodore Overholt and Michael Livermore when they worked on jobs performed by Union contractors and never owed for the other employees.  In actuality, Anders owed contributions for all employees on all jobs performed by Anders that was bargaining unit work.  Cathy Overholt underpaid contributions based on her misunderstanding for fifteen years without question from the Union.

Plaintiffs note the MLAs do not limit their scope to work performed by Union employees on "union jobs."  Moreover, plaintiffs claim that misunderstanding the terms of the MLAs is not a defense to enforcement of the contracts.

As a general matter, federal law governs parties' rights in ERISA actions.  Employer Painters' Trust v. J&B Finishes, 77 F.3d 1188, 1191 (9th Cir. 1996) (refusing to join the Second Circuit's adoption of state law for interpretation of a labor contract).  A signatory of a short form agreement is bound by the terms of the MLA, even if the signatory never read the MLA or understood the consequences of signing the short form agreement.  Id.  In J&B Finishes, the court concluded the employer's president was personally liable for unpaid contributions and union dues, as stated in MLA, even though the president was unaware of the term before he executed the short form agreement.  Id. at 1190, 1192.

As discussed above, the terms of the Compliance Agreement and the MLAs are clear, and the court must enforce the terms against Anders, even though the Overholts did not understand how the contractual provisions worked.

Page 9 - OPINION AND ORDER

B.    Contract Bar Rule

Anders argues that the three-year contract bar doctrine makes Anders' March 25, 2011 letter withdrawing recognition of the Union timely and effective.  Anders describes the contract bar rule as the doctrine under which the National Labor Relations Board will entertain a representation election for any bargaining unit when an ongoing CBA is greater than three years in length.

Plaintiffs disagree that Anders' March 25, 2011 letter was an effective withdrawal but note they only seek contributions due during the audit period running from July 1, 2006 through June 30, 2010.

Because plaintiffs are voluntarily limiting the time period for which they seek unpaid contributions, I agree that it is unnecessary for me to determine whether the March 25, 2011 letter is an effective withdrawal from the Union.

C.    Equitable Estoppel

Based on Cathy Overholt's underpayment of contributions for fifteen years with no complaint from the Union, Anders contends the Union is equitably estopped from collecting the unpaid contributions now.  Anders notes that Union representatives were present at jobs for which Anders did not make all required contributions.

Plaintiffs claim Anders has no evidence that the trust funds, as opposed to the Union, knew prior to the audit that Anders' employees were performing bargaining unit work for which Anders was not paying the required contributions.

The elements of equitable estoppel are:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

Operating Eng'rs Pension Trust v. Cecil Backhoe Serv., Inc., 795 F.2d 1501, 1507 (9th Cir. 1986).

Moreover, a union and its representatives are not agents of a trust fund created under a CBA. Thus, the trust fund cannot be estopped based on the actions of the union or its representatives. Id.

There is no evidence that the trusts knew of the unpaid contributions prior to the audit, even though Union representatives were at some of the job sites.

Concerning the claim for unpaid union dues, plaintiffs argue Anders has no evidence the Union intended for Anders not to correctly pay dues for all employees. I agree there is no evidence, or even an alleged motive, for the Union to intend for Anders to incorrectly underpay union dues.

I also note that an estoppel defense cannot be based on delay alone. Id. I conclude there is no factual issue suggesting plaintiffs are equitably estopped from bringing their claims, and I reject Anders' defense on this ground.

IV.    Damages

ERISA provides damages for the recovery of delinquent contributions as follows:

> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan–

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of–

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.

29 U.S.C. § 1132(g)(2).

Anders does not question the payroll audit and calculations performed by plaintiffs' CPA,

Earl Ratliff.  According to Ratliff, Anders owes the following amounts to plaintiffs:

1.    $186,800.43 in fringe benefits contributions and union dues;

2.    $56,161.06 in interest calculated through January 20, 2011, with interest continuing to accrue on the unpaid fringe benefit contributions ($171,812.02) at the rate of 12% per annum from January 21, 2011, through entry of judgment, and interest continuing to accrue on the unpaid union dues ($14,988.41) at the rate of 9% per annum from January 21, 2011, through entry of judgment;

3.    $30,199.33 in liquidated damages as of January 20, 2011, with liquidated damages continuing to accrue in an amount equal to one percent (1%) of the unpaid fringe benefit contributions ($171,812.02) for each monthly period on and after January 20, 2011, that they remain unpaid; and

4.    $2,043.00 in payroll examination fees.

I grant summary judgment to plaintiffs and award damages as calculated by Ratliff. I also award attorney fees. Plaintiffs may move for attorney fees as provided under the court's Local Rules.

## CONCLUSION

Defendant's Motion for Summary Judgment [15] is denied. Plaintiffs' Motion for Summary Judgment [23] is granted. I will enter Judgment in accordance with this Opinion.

IT IS SO ORDERED.

Dated this _____16th_____ day of November, 2011.


       /s/ Garr M. King
Garr M. King
United States District Judge